UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| VIGILANT INSURANCE COMPANY,<br><br>Plaintiff,<br>v.<br><br>ENERGY SAVINGS PRODUCTS, LTD.,<br><br>Defendant.<br><br>ENERGY SAVINGS PRODUCTS, LTD.,<br><br>Third-Party Plaintiff,<br>v.<br><br>CUSTOM COILS, INC.,<br><br>Third-Party Defendant. | Civil Action No. 15-11495 |

## MEMORANDUM AND ORDER

**CASPER, J.**  May 1, 2017

### I.  Introduction

Plaintiff Vigilant Insurance Company ("Vigilant") has filed this lawsuit against Defendant Energy Savings Products, Ltd. ("Energy Savings") alleging negligence and breach of the implied warranty of merchantability in the sale and installation of a heating, ventilation, and air conditioning ("HVAC") unit that was placed into the residence of Vigilant's insured.  D. 1.  In turn, Energy Savings has filed a third-party complaint against Custom Coils, Inc. ("Custom Coils"), the manufacturer of a component of the HVAC unit, alleging contribution (Count I), breach of contract (Count II), indemnification (Count III), breach of the implied warranty of

1

merchantability and fitness for usage of trade (Count IV) and breach of the implied warranty of merchantability for a particular purpose (Count V). D. 10. Custom Coils has now moved for summary judgment. D. 36. Vigilant has also moved for leave to file an amended complaint to assert claims directly against Custom Coils. D. 35. For the reasons stated below, the Court DENIES Custom Coils's motion for summary judgment and GRANTS Vigilant's motion for leave to file an amended complaint.

## II. Standard of Review

Summary judgment is proper if the movant shows that "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Ahmed v. Johnson, 752 F.3d 490, 495 (1st Cir. 2014). "A dispute is genuine if "the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party.'" Johnson v. Univ. of P.R., 714 F.3d 48, 52 (1st Cir. 2013) (quoting Thompson v. Coca–Cola Co., 522 F.3d 168, 175 (1st Cir. 2008)). "A fact is material if it has potential to determine the outcome of the litigation." Id. (quoting Maymi v. P.R. Ports Auth., 515 F.3d 20, 25 (1st Cir. 2008)).

In determining whether a movant has met its burden, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. Johnson, 714 F.3d at 52. Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must produce "specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." Fed. R. Civ. P. 56(c); Brooks v. AIG SunAmerica Life Assur. Co., 480 F.3d 579, 586 (1st Cir. 2007) (quoting Clifford v. Barnhart, 449 F.3d 276, 280 (1st Cir. 2006)). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with

sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." In re Spigel, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

### III. Factual Background

The following facts are drawn from Custom Coils's Rule 56.1 statement of material facts (included in its motion for summary judgment), D. 36-1, Energy Savings's response to Custom Coils's statement of material facts, D. 40, and supporting documents, all of which are undisputed unless otherwise noted.

On November 1, 2013, a property owner insured by Vigilant sustained property damage as a result of water discharge from an Energy Savings HVAC unit, Model Number HE-70H (the "unit"). D. 36-1 at 1; D. 40 ¶ 1. The unit was installed at the insured's vacation home located at 45 Point Road, North Falmouth, Massachusetts (the "Property"), at some point in 2010. D. 36-1 at 1; D. 40 ¶ 2. Following the water leak, the unit was inspected and a substantial dent and crack was found in the header pipe of the unit's hot water coil. D. 36-1 at 1-2; D. 40 ¶ 3.

The damaged coil was originally manufactured by Custom Coils in 2008 and had been ordered by Energy Savings for installation in the unit pursuant to a purchase order and invoice for ninety-six model #20-5303 coils. D. 36-1 at 2-3; D. 40 ¶¶ 6, 7, 23. The coil was made by assembling copper tubes and manifolds according to particular specifications provided to Custom Coils by Energy Savings. D. 36-1 at 2; D. 40 ¶ 11. That is, Custom Coils produced this coil specifically for Energy Savings. Id.

Prior to shipment to Energy Savings, Custom Coils inspected and tested each coil. D. 36-1 at 2; D. 40 ¶ 9. Per standard operating procedure, coil shipments arriving at Energy Savings's facility—including the one that contained the coil at issue here—are inspected by Energy Savings employees. D. 36-1 at 3; D. 40 ¶¶ 16, 17. The coils were removed from their containers and then

visually inspected for any abnormalities such as "dings, dents, or misformations." D. 36-1 at 3; D. 40 ¶ 16. If a coil passes inspection, Energy Savings then installs it into an HVAC unit. D. 36-1 at 3; D. 40 ¶ 20. Energy Savings has stated that, had it received a coil in the condition found in the incident HVAC unit, it would not have installed the coil and would have instead returned it to Custom Coils. D. 36-1 at 3; D. 40 ¶ 21. Thus, both parties agree that the mechanical damage that was observed on the coil at issue here occurred at some point after manufacturing, leak testing, assembly and inspection. D. 36-1 at 4; D. 40 ¶ 26. Following the initiation of this lawsuit, the incident coil and exemplar coils were subject to various tests to determine the cause of the leak. D. 36-9; D. 40-2; D. 40-3; D. 40-4. These tests included nondestructive and destructive examination of the subject coil and an exemplar coil, as well as metallurgical testing. D. 36-9; D. 40-2; D. 40-3; D. 40-4. The various experts retained by the parties have come to conflicting theories of liability pertaining to the leak's origin. See D. 36-9; D. 40-2; D. 40-3; D. 40-4.

### IV. Procedural History

Vigilant instituted this action on April 1, 2015. D. 1. Energy Savings filed its third-party complaint against Custom Coils on June 26, 2015. D. 10. Vigilant has now moved for leave to file an amended complaint and Custom Coils has moved for summary judgment as to the third-party claims against it. D. 35; D. 36. The Court heard the parties on the pending motions on March 16, 2017 and took these matters under advisement. D. 45.

### V. Discussion

#### A. **Breach of Warranty**

Custom Coils argues that there is insufficient proof that any actions on its part caused the coil failure that led to the unit's leak and, therefore, summary judgment in its favor is warranted as to Energy Savings's breach of warranty claims. D. 36-1 at 7. Custom Coils maintains that,

4

after leaving its possession, an impact of unknown origin dented and cracked the joint. Id. According to this theory, damage caused by this unknown impact progressed over time until the crack formed through the joint and water leaked out. Id.

Under Massachusetts law, "[l]iability for breach of warranty is premised on the principle that [t]he seller warrants that the product is fit for the ordinary purposes for which such goods are used. Thus a breach of warranty can occur if either (1) the product is defectively designed, or (2) foreseeable users are not adequately warned of the dangers associated with its use." Kearney v. Philip Morris, Inc., 916 F. Supp. 61, 64 (D. Mass. 1996) (citations and internal quotations omitted). As to a design defect theory, Massachusetts law also requires that the plaintiff demonstrate that the manufacturer of a good has failed in its duty to design its products "so that they are reasonably fit for the purposes for which they are intended." Id. (quoting Smith v. Ariens Co., 375 Mass. 620, 624 (1978)).[1] The First Circuit has explained that "the presence of a defect typically cannot be inferred in the absence of expert testimony." King v. Pierce Mfg., Inc., 608 F. App'x 18, 20 (1st Cir. 2015) (internal quotations and citations omitted). Indeed, "[s]uch testimony is required in complex product liability cases in order to mitigate against jury 'conjecture and surmise' regarding the cause of the injuries at issue and the relevant standard of care." Id. Thus, for a product to be "reasonably fit" for its purposes, expert testimony should demonstrate that the design avoids the

---

[1] The warranty of fitness for a particular purpose is similar to the warranty of merchantability but applies only "where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods." Mass. Gen. L. c. 106, § 2–315. "A 'particular purpose' differs from an 'ordinary purpose' in that it 'envisages a specific use by the buyer which is peculiar to the nature of his business.'" Id. Here, it is undisputed that Custom Coils supplied coils to Energy Saving that were manufactured and designed specifically according to Energy Savings's specifications for use in its HVAC units. As such, the Court deals with Energy Savings's claims of breach of the implied warranty of merchantability and fitness for usage of trade (Count IV) and breach of the implied warranty of merchantability for a particular purpose (Count V) together.

5

"reasonably foreseeable risks attending the product's use." Back v. Wickes Corp., 375 Mass. 633, 641 (1978).

Custom Coils, Energy Savings and Vigilant each retained experts as to the likely cause of the leak and the various factors that contributed to the crack found in the incident coil. As briefly summarized above, Custom Coils's expert, Noah Budiansky—a senior managing engineer with expertise in metallurgy and corrosion engineering—determined that the leak of the unit occurred as a result of mechanical damage sustained by the coil that then continued to grow as time passed. D. 36-9 at 42. Budiansky then determined that "[t]he initial mechanical damage caused deformation of the coil manifold resulting in compression of the copper tube resulting in sufficient stress to cause a cohesive ductile fracture in the copper tubing material along the copper manifold braze joint interface." Id. Because he found the presence of copper on both sides of the interface, Budiansky surmised that "the braze joint was properly bonded and was stronger than the individual joint materials." Id. Finally, he found that there was nothing to suggest abnormal or incomplete fusion of the braze joint on the coil's manifold, indicating "that the design and manufacturing of the braze is sufficient for its intended operating conditions." Id. at 43. Accordingly, Budiansky concluded that "the brazing process did not contribute to the failure of the 'Top' incident braze joint." Id. at 44.

The opinion of Vigilant's expert, Victor Popp—a licensed engineer, home inspector and construction supervisor with over thirty-two years of engineering experience—contradicts that proffered by Budiansky. D. 40-2. In his expert report, Popp explained that "the brazing joint failed as a longer-term result of the crushing that occurred to the header. Id. at 18. Additionally, it is a concern that the brazed joint may not have been properly designed or manufactured adequately to prevent the cracking that ultimately occurred." Id. In other words, Popp expressed

concerns that the overall design of the coils produced by Custom Coils was inadequate and that this faulty design may have had a causal link to the leak that occurred in the unit. Popp further opined that "[t]he header could also have been damaged during some other part of the manufacturing process – either during manufacturing of the coil itself, or after the coil was installed in the air handler unit." Id. at 19.

Vigilant's other expert, Craig Clauser—an engineering consultant with an expertise in metallurgy—similarly determined that Custom Coils's design of the coil caused the eventual crack that was found in the incident coil. Based on his investigation of the evidence, he concluded that:

> [t]he defective design (excessive joint width) and poor quality (gas porosity and lack of bonding manufacturing defects) resulted in cracking of the braze joint when the port tube was pushed inward. After the HVAC unit with the cracked port to header tube braze joint was placed in service the crack propagated and resulted in leakage. A properly designed and manufactured braze joint would have been tough enough to resist cracking when deformed and would not have failed in service.

D. 40-4 at 5. He further opined that:

> [t]he subject design opted for a butt joint rather than a lap joint. The butt joint was less expensive to fabricate and this was a cost savings. If one is using the less efficient (butt) joint, quality and fit-up are even more important to produce an acceptable joint.
>
> The Custom Coils braze joints including the incident joint contained many defects, both unbrazed areas (lack of bonding) and porosity as shown above. The joint gap or clearance . . . was, in fact, over tens greater than the maximum acceptable gap based on the [American Welding Society] recommendations.

Id.

Finally, Energy Savings's expert Susan Freeman, a metallurgy expert, found phosphorous present in the material used by Custom Coils to braze the joints of the coil. D. 40-3 at 9. She explained that while phosphorous may be beneficial in some aspects of the brazing process, it can result in a harder and more brittle alloy. Id. According to Freeman, this condition could have contributed to the leak found in the incident coil. Id. at 10. Indeed, Freeman found that:

7

> The braze joint was a tee joint that was fabricated without full penetration of the piping into the manifold. This joint created a ligament filled with braze metal between the pipe and manifold. The incident and the exemplar units both showed that complete insertion of the pipe (supply or discharge) into the manifold was not done as part of the fabrication. This fit-up between the pipe and manifold is an open joint rather than a fillet joint, leaving the ligament of braze material as the support. It was at this ligament that the incident manifold failed, specifically at the interface between the braze material and the manifold.
>
> The incident failed braze joint also showed areas of lack of fusion at the joint. The lack of fusion was approximately 50% of the braze wall thickness. This lack of fusion would be a contributing factor to the cause of the coil leak.

Id.

To prove its breach of warranty claims, Energy Savings must show that Custom Coils's products were, more likely than not, both the cause-in-fact and the proximate cause of the alleged injury. See Colter v. Barber–Greene Co., 403 Mass. 50, 61 (1988). Here, there is disagreement among the various experts offered by the parties as to what actually caused the damage found on the incident coil. While Custom Coils maintains that it did not contribute to the ultimate leak that occurred in the unit, it solely upon its own expert and fails to address adequately the competing theories put forth by both Vigilant and Energy Savings. This weighs heavily against granting summary judgment. See One Beacon Ins. Co. v. Electrolux, 436 F. Supp. 2d 291, 296 (D. Mass. 2006) (denying motion for summary judgment where "[p]laintiffs' and defendants' experts disagree about the existence of an inherent defect in the manufacture or design of the incident [product]").

In addition, proximate causation requires a showing that the harm was reasonably foreseeable. Nna v. Am. Standard, Inc., 630 F. Supp. 2d 115, 130 (D. Mass. 2009). Custom Coils argues that it was not foreseeable that its coils might be subjected to a force that would cause it to sustain the damage seen in the incident coil. D. 36-1 at 8. Indeed, Custom Coils takes issue with the testing performed by Vigilant's expert, Popp, which applied a certain 640 lbs. load to an exemplar coil to induce a deformation scenario that would result in damage similar to that seen in

8

the incident coil.  Id.  It argues that such a load—which is equivalent to eight bundles of roofing shingles or three adult men sitting together—is an unforeseeable circumstance that would not occur during normal handling or operational conditions.  Id. at 5.  But Custom Coils's argument is unavailing because it ignores the fact that the inducement of the 640 lbs. load onto the exemplar coil was meant solely to get it to be in nearly the same deformed condition as the coil that caused the loss.  D. 40-2 at 14.  While it took nearly three years between the installation of the incident HVAC unit and its eventual leak, the test performed by Popp took place in a much shorter time frame.  Id. at 20.  As another expert, Clauser, has stated, "[t]he presence of a crack in a structure weakens the structure by reducing the load bearing cross section and by acting [sic] a stress concentration.  The cracking that occurred when the header was deformed weakened the joint and allowed it to subsequently further crack and leak in service."  D. 40-4 at 5.  In other words, the 640 lbs. load did not necessarily simulate the force that was actually applied to the incident coil, since the incident coil was already allegedly damaged and would have gradually deformed under less pressure over a three year timeframe.  Instead, it was used to create a similarly deformed exemplar coil.

The question of foreseeability is best approached by examining the testimony Custom Coils's corporate designee gave during his Fed. R. Civ. P. 30(b)(6) deposition.  There, the designee noted that numerous coils had been returned by customers as a result of leaks that Custom Coils believed were likely sustained during shipping or installation, D. 36-6 at 6-7, which—according to Energy Savings—defeats the notion that the mechanical damage to the incident coil was unforeseeable, D. 39-1 at 11.  Moreover, at least one expert has declared that damage caused by "[a]n inward force against the end of a port tube sufficient to deform the header was foreseeable" and that, "[f]or this reason, as well as general good design practice, the port tube to header tube

9

braze joint should have been configured and executed in a manner to produce a strong and tough (not brittle) joint." D. 40-4 at 5. For purposes of summary judgment, then, there is at least a question of fact as to the foreseeability of coil damage similar to that which occurred with the incident coil in the unit. Such a question is one for the jury. See Sinicrope v. Keller Indus., Inc., No. CIV.A 95-30002-MAP, 1997 WL 115841, at *3 (D. Mass. Mar. 13, 1997).

Finally, Custom Coils argues in its reply brief that the Court should view Energy Savings's breach of warranty claims as alleging defective manufacturing of the coil rather than being claims brought under a theory of defective design of the coil product line. D. 44 at 2-3. "In the [latter] instance, a plaintiff need only prove that a defect in the design existed at the time the product left the manufacturer—he or she has no obligation to negate the possibility of subsequent mishandling of the product by intermediaries." Brown v. Husky Injection Molding Sys., Inc., 751 F. Supp. 2d 298, 303 (D. Mass. 2010). But for claims premised on a theory of defective manufacture:

> a particular product, rather than a line of products, is alleged to be defective because of negligence in the manufacturing process. Because the defect is alleged to have been caused by a manufacturing error affecting only one particular product, to show that the defect is attributable to the manufacturer, the plaintiff must show that it was not caused by intermediaries.

Id. (quoting Smith v. Ariens Co., 375 Mass. 620, 626-27 (1978)).

Here, however, Energy Savings's third-party complaint alleges a defect in the design of the coil, D. 10 ¶ 19 (alleging, among other things, that "third-party defendant breached the implied warranty of merchantability in the design . . . of the copper coil contained in the Hi-Velocity HE-70 Heating Fancoil the plaintiff claims discharged a large volume of water throughout the Subject Premises . . ."), and with the benefit of discovery Energy Savings has been able to provide expert testimony supporting such a claim. D. 40-2 at 18 (noting that it was "a concern that the brazed joint may not have been properly designed or manufactured adequately to prevent the cracking that ultimately occurred"); D. 40-4 at 5 (noting that "[t]he defective design (excessive joint width)

10

and poor quality (gas porosity and lack of bonding manufacturing defects) resulted in cracking of the braze joint when the port tube was pushed inward"). In other words, Energy Savings has not only alleged that the defects present in the incident coil are the result of the manufacturing process. Instead, the evidence presented in support of the breach of warranty claims also focuses on the coil's design scheme and the types of chemicals used in the brazing of the coil's parts. Even if the Court were to view the allegations as based solely upon a theory of defective manufacturing, the Court would still deny summary judgment. Indeed, the case Custom Coils relies upon, Brown v. Husky Injection Molding Sys., Inc., 751 F. Supp. 2d at 303, suggests that in bringing a manufacturing defect claim, a plaintiff is not required to make an affirmative showing that intermediaries were uninvolved in the harm that occurred. Id. Rather, the crux of the inquiry is still whether there is "a greater likelihood that his injury was caused by the defendant's negligence than by some other cause." Id. (quoting Coyne v. John S. Tilley Co., 368 Mass. 230, 239 (1975)). Here, the ultimate cause of the leak and which party is primarily responsible for its occurrence remains disputed. Thus, the Court DENIES summary judgment as to both breach of warranty claims.

### B. <u>Indemnification</u>

Under Massachusetts law, the right to common law indemnification "allows someone who is without fault, compelled by operation of law to defend himself against the wrongful act of another, to recover from the wrongdoer the entire amount of his loss." Elias v. Unisys Corp., 410 Mass. 479, 482 (1991). That said, "the right to indemnity is limited to those cases where the person seeking indemnification is blameless, but is held derivatively or vicariously liable for the wrongful act of another." Ferreira v. Chrysler Grp. LLC, 468 Mass. 336, 344 (2014). Thus, "[t]he general rule is that a person who negligently causes injury to a third person is not entitled to

indemnification from another person who also negligently caused that injury." Id. (quoting Fireside Motors, Inc. v. Nissan Motor Corp. in U.S.A., 395 Mass. 366, 370 (1985)).

Custom Coils argues that there is no way a jury could find it liable for the property damage caused as a result of the leak without also finding Energy Savings liable and, consequently, the indemnification claim must fail. D. 36-1 at 9. Custom Coils notes that, by its own admission, Energy Savings would not have installed the coil into the unit if it had noticed the level of deformation that was seen following the coil's post-leak inspection. Id. at 3. Thus, even if Custom Coils breached its implied warranty of merchantability by negligently supplying a faulty coil, Custom Coils argues that Energy Savings acted negligently in failing to reject the coil during its inspection process. Id. at 9. As such, Custom Coils concludes that any common law indemnification claim is barred.

Custom Coils's argument is unpersuasive, however, because it does not credit the dispute that exists among the parties regarding both the actual and proximate causes of the leak. Indeed, as noted above, several experts—from Energy Savings and Vigilant—have concluded that the leak resulted from deficiencies in the type of braze used to construct the coil. D. 40-2 at 10-11; D. 40-3 at 18-20; D. 40-4 at 5-7. Moreover, Custom Coils has conceded that other coils have been returned after suffering leaks despite those coils having passed its internal leak testing process. D. 36-6 at 6-7. Viewing this evidence in the light most favorable to Energy Savings, there is at least a possibility that the incident coil could have contained damage not detected during either a leak test or a visual inspection such that a jury might find that responsibility for the condition that led the coil to leak rests solely with Custom Coils. Where, as here, there is a question of fact as to the cause of the harm that occurred, the indemnification claim survives summary judgment.

Lastly, Custom Coils appears not to have argued why summary judgment should be granted in its favor regarding the contribution claim and, therefore, the Court does not reach the issue.

C. **Breach of Contract**

Custom Coils also argues that there can be no breach of contract claim because, in fact, there was no valid, binding contract between Custom Coils and Energy Savings. D. 36-1 at 9. Custom Coils, however, does not articulate on what basis it is challenging the validity of the contract. See id. "A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." Mass. Gen. L. c. 106, § 2-204(1). Moreover, "an order or other offer to buy goods for prompt or current shipment shall be construed as inviting acceptance either by a prompt promise to ship or by the prompt or current shipment of conforming or non-conforming goods." § 2-206(2). Here, all of the necessary elements for contract formation are in place. Energy Savings submitted a purchase order to Custom Coils for ninety-six custom-made coils on April 21, 2008. D. 40-1 at 14. A little more than a month later, on May 23, 2008, Custom Coils issued an invoice for the same ninety-six coils, id. at 10, and shipped them to Energy Savings on the same date, id. at 11. Thus, by shipping the coils Energy Savings requested, Custom Coils recognized the existence of a contract between the two parties. See Lambert v. Kysar, 983 F.2d 1110, 1116 (1st Cir. 1993) (citing Mass. Gen. L. c. 106, § 2-206(2)) (finding that a Christmas tree seller entered into a contract by "seasonably shipping the number of Christmas trees requested in [the purchase order]"). Furthermore, as Energy Savings argues, the contract is not susceptible to a defense based on the statute of frauds. See D. 39 at 13-14. Not only did Custom Coils confirm the contract in writing by issuing an invoice that reflected the terms of Energy Savings's purchase order, but Custom Coils manufactured a custom-made product for Energy Savings. See Mass. Gen. L. c. 106, § 2-

201(2) (a contract "between merchants" is valid under the statute of frauds "if within a reasonable time a writing in confirmation of the contract . . . is received"); id. § 2-201(3)(a) (a contract is valid under the statute of frauds "if the goods are to be specially manufactured for the buyer and are not suitable for sale to others in the ordinary course of the seller's business"). For these reasons, the Court DENIES summary judgment as to the breach of contract claim.

### D. Plaintiff's Motion for Leave to Amend

Vigilant has moved for leave to file an amended complaint to incorporate claims directly against Custom Coils and modify its existing claims against Energy Savings. D. 35 ¶ 12. Fed. R. Civ. P. 14 allows a party to bring against a third-party plaintiff "any claim arising out of the transaction or occurrence that is the subject matter of the plaintiff's claim against the third-party plaintiff."[2] Fed. R. Civ. P. 14(a)(3). Under Rule 15(a)(2), "[t]he [C]ourt should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). The Court may deny leave to amend, however, for reasons including "undue delay, bad faith, dilatory motive of the requesting party, repeated failure to cure deficiencies, and futility of amendment." Hagerty ex rel. United States v. Cyberonics, Inc., 844 F.3d 26, 34 (1st Cir. 2016).

As to undue delay, Custom Coils observes that Vigilant filed its initial complaint in April 2015, Energy Savings filed its third-party complaint against Custom Coils in June 2015 and the deadline for amended pleadings passed in November 2015. D. 1, 10, 27. Additionally, Custom Coils alleges that Vigilant possessed the unit from December 2013 to November 2016 and that Vigilant's expert, Popp, identified Custom Coils as the manufacturer of the incident coil on

---

[2] In its brief, Vigilant raises a potential issue related to the statute of limitations for its claims, D. 35 at 4, but Custom Coils does not address the issue, see D. 37. Regardless, the Court agrees with Vigilant that its potential claims against Custom Coils would not be time-barred because they arise out "of the conduct, transaction, or occurrence set forth . . . in the original pleading." Mass. R. Civ. P. 15(c).

14

December 12, 2013.  Id. at 2.  Accordingly, Custom Coils argues that there was nothing to prevent Vigilant from asserting claims against Custom Coils at an earlier stage in the litigation.  Id. at 4. "In these cases, a movant has '[at the very least] the burden of showing some valid reason for his neglect and delay.'"  Hagerty, 844 F.3d at 34 (quoting Perez v. Hosp. Damas, Inc., 769 F.3d 800, 802 (1st Cir. 2014)) (alteration in original).  To determine whether the movant has met this burden, the Court must examine what the movant "knew or should have known and what [it] did or should have done."  Leonard v. Parry, 219 F.3d 25, 30 (1st Cir. 2000).  For its part, Vigilant insists that it is seeking to amend its complaint because of a "recent [November 2016] metallurgical testing/inspection which all parties attended, and which led to at least partial agreement between Vigilant's expert and [Energy Savings]'s expert that deficiencies in [incident coil] were a contributing factor to the water leakage."  D. 35 ¶ 20.  While it is perhaps arguable that Vigilant could have reached this conclusion at an earlier stage of the litigation, new information learned through discovery is nonetheless a "valid reason" for delay in bringing claims against a party. Travelers Prop. Cas. Co. of Am. v. Noveon, Inc., 248 F.R.D. 87, 91 (D. Mass. 2008).  Accordingly, the Court does not conclude that there has been undue delay in Vigilant's seeking leave to amend.

Custom Coils's remaining arguments are also not persuasive.  Vigilant seeks to amend its complaint to add claims against Custom Coils that are substantially the same as the claims that Energy Savings already has asserted against Custom Coils.  Casey v. United States, 635 F. Supp. 221, 227 (D. Mass. 1986) (allowing a party to amend its claims late in the litigation because "the liability claim [was] identical" to a claim already asserted by a different party).  Moreover, while Custom Coils suggests that it would be prejudiced if the Court were to allow Vigilant to add claims

15

at this late stage, Custom Coils does not explain what form this prejudice might take.[3] Cf. Steir v. Girl Scouts of the USA, 383 F.3d 7, 12 (1st Cir. 2004) (quoting Acosta-Mestre v. Hilton Int'l of P.R., Inc., 156 F.3d 49, 52 (1st Cir. 1998) (noting that "motions to amend whose timing prejudices the opposing party by 'requiring a re-opening of discovery with additional costs, a significant postponement of the trial, and a likely major alteration in trial tactics and strategy'" are particularly disfavored). Finally, Custom Coils's argument based on futility of amendment incorporates the arguments from its motion for summary judgment as to Energy Savings's third-party claims. D. 37 at 5. But, for reasons the Court has already discussed in denying the motion for summary judgment, the claims against Custom Coils that Vigilant proposes to add to its complaint would not be futile.[4] For these reasons, the Court GRANTS Vigilant's motion for leave to amend its complaint.

## VI. Conclusion

For the foregoing reasons, the Court DENIES Custom Coils's motion for summary judgment, D. 36, and GRANTS Vigilant's motion for leave to amend its complaint, D. 35.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge

---

[3] Custom Coils does mention that "[e]xtensive discovery and product inspection/testing have been undertaken" and that it "incurred the substantial expense of preparing and filing a Motion for Summary Judgment on the Third-Party Complaint." D. 37 at 4. However, considering that Vigilant proposes to assert substantially the same claims against Custom Coils as Energy Savings has done already and that the Court has denied summary judgment as to Energy Savings's claims, there is no indication of a need to re-open discovery or brief an additional motion for summary judgment.

[4] At the motion hearing, counsel for Custom Coils suggested that if the Court were to allow Vigilant's motion to amend, then it might seek summary judgment as against Vigilant. Given that Vigilant's claims directed against Custom Coils mirror those asserted by Energy Savings and given that the Court has now denied summary judgment to Custom Coils as to the Energy Savings claims because of the disputed issue of causation, it appears that any such motion for summary judgment by Custom Coils pertaining to Vigilant's claims would also be futile.

16